HENRIETTA I. LEWIS, administratrix, *vs.* COMMISSIONER OF BANKS.

Suffolk.    April 5, 1934. — May 31, 1934.

Present: RUGG, C.J., PIERCE, DONAHUE, & LUMMUS, JJ.

*Trust Company,* Deposit for safe keeping, Liquidation, Savings department, Commercial department. *Bank and Banking. Bailment. Agency,* Scope of authority, Termination. *Executor and Administrator,* De son tort.

A trust company, under G. L. c. 172, § 31, received for safe keeping a bond of the United States, with instructions from the depositor to collect the interest accruing thereon and to deposit it in a savings account which he had in the trust company, but without any instructions as to the disposition of the principal if the bond were paid. The depositor had no commercial account in the trust company. Thereafter, to the knowledge of the trust company, the depositor became insane; and he later died, the trust company having no knowledge of his death. Subsequently, at the time when the bond matured, the trust company presented it to the Federal Reserve Bank for payment; that bank

credited the amount thereof to the commercial department of the trust company; the commercial department thereupon issued its check for a certain sum, which included the amount of the bond, to the savings department; and a teller in the savings department credited the amount of the bond to the depositor's savings account. Later, an officer of the trust company notified the savings department that the amount of the bond had been improperly deposited in the savings department, caused such amount to be transferred to the commercial department, and issued a certificate of deposit therefor. Afterwards, the commissioner of banks took possession of the trust company in liquidation proceedings, and the depositor's personal representative was appointed. Because of the great number of transactions carried on by the trust company between the time of the payment of the bond and the time when the commissioner took possession, the amount of the bond could not be traced to any particular fund. *Held*, that

(1) The insanity of the depositor suspended the authority of the trust company as his agent or as bailee, and his death terminated such authority; and thereafter the trust company was required to exercise reasonable diligence in caring for the bond until the appointment of the depositor's personal representative;

(2) There being no agreement between the depositor and the trust company as to the disposition of the principal of the bond after payment thereof, the principal, upon being paid to the trust company, became a "general" deposit by reason of said § 31;

(3) It was within the authority of the trust company's officer, in the circumstances, to cause the transfer of the amount of the bond from the savings department to the commercial department;

(4) In the circumstances, the action of the trust company in procuring payment of the bond after the depositor's death did not, by operation of law, create a special deposit in the commercial department to which the depositor's personal representative could look for full reimbursement;

(5) The personal representative had no preferential claim in the savings department or in the commercial department of the trust company;

(6) The principles of law pertaining to executors *de son tort* were not applicable;

(7) The personal representative was not entitled to prove his claim for the amount of the principal of the bond as a deposit in the savings department of the trust company or as a special deposit in its commercial department, but only as an ordinary deposit in its commercial department.

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on December 28, 1932, described in the opinion.

The petition was referred to a master. He found that "owing to the great number of transactions carried on by the . . . [trust company] between September 15, 1928,

and April 25, 1932, the date of its closing, the said sum of $1,327.67 cannot be traced to any particular fund." Other material findings by him are stated in the opinion.

The petition thereafter came on to be heard by *Field,* J., who ruled as follows: "The intestate deposited his bonds with the . . . [trust company] on the terms that the interest collected should be deposited in the savings department, and the duty to make such deposit continued after the death of the intestate. The petitioner, therefore, is entitled to prove her claim for such interest as for a savings deposit. There was, however, no such provision in regard to the principal of the bonds and the proceeds thereof continued to be a 'general deposit.' Since these proceeds cannot be traced, the petitioner can prove her claim therefor only as for a deposit in the commercial department." By order of the single justice, there were entered an interlocutory decree confirming the master's report, and a final decree ordering that the petitioner "be allowed to prove her claim for $27.67 for the interest collected on the bonds, as a savings deposit," and that she "be allowed to prove her claim for $1,300 for the principal on the bonds, for a deposit in the commercial department."

The petitioner appealed from the final decree.

*J. E. Hannigan, (E. C. Upton* with him,) for the petitioner.

*E. S. Abbott,* for the respondent.

PIERCE, J. This is a petition against the commissioner of banks to establish an account in the savings department of the Exchange Trust Company (hereinafter called the bank) or in the alternative, if the petition be denied, to establish a special deposit in the commercial department of said bank. The case was heard after the completion of the pleadings and the filing of a master's report, which was confirmed, by a single justice of this court, who ruled against the granting of the petition on the principal ground of relief sought and ordered a final decree to be entered in accord with his rulings, which are set out in the record. The case is before this court on appeal of the petitioner from said final decree.

The facts are as follows: The bank conducted, during the period here covered, a savings and a commercial department. On April 25, 1932, the commissioner of banks, herein named respondent, under G. L. c. 167, took possession of the bank and is now liquidating its affairs. Under G. L. c. 172, § 31, the bank, in 1918, undertook in connection with its banking business to accept government bonds for safe keeping. Said § 31, so far as here material, reads: "Such corporation may receive on deposit, storage or otherwise, money, government securities, stocks, bonds, coin, jewelry, plate, valuable papers and documents, evidences of debt, and other property of any kind, upon terms or conditions to be agreed upon, and at the request of the depositor may collect and disburse the interest or income, if any, upon said property received on deposit and collect and disburse the principal of such of said property as produces interest or income when it becomes due, upon terms to be prescribed by the corporation. Such deposits shall be general deposits, and may be made by corporations and persons acting individually or in any fiduciary capacity." Each depositor of bonds was requested to sign a safe keeping card bearing his name and address, the number of his account and a description of the bonds deposited. These cards read, in part, as follows: "I hereby request the EXCHANGE TRUST COMPANY to collect the interest on United States Government Bonds held for my account, when said interest becomes due and payable, and deposit the proceeds on my Savings or Checking Account."

On November 23, 1918, one Thornton B. Lewis left with the bank for safe keeping three "Third Liberty Loan Bonds" of $100 each; on December 24, 1918, he deposited the sum of $100 in the savings department of the bank and received a pass book No. 61023; thereafter he left with the bank for safe keeping, on September 23, 1919, three "Victory Liberty Loan Bonds" of $100 each; on April 27, 1920, two "Third Liberty Loan Bonds" of $100 each and one "Third Liberty Loan Bond" of $500; and on September 30, 1920, three "Third Liberty Loan Bonds" of $100 each. Upon receipt of each of said bonds the bank gave said Lewis a

receipt, which, omitting caption, date and signatures of bank officials, reads: "Received of THORNTON B. LEWIS — FOR SAFE KEEPING UNITED STATES LIBERTY BOND as described in the accompanying schedule on the reverse side of this receipt; same to be delivered only upon the return of this receipt properly endorsed. Coupons to be detached and credited to the account according to instructions on file. Par Value of Bonds." On the occasion of each bailment, perhaps with the exception of the deposit of ·November 23, 1918, said Lewis requested the bank to collect the interest on said bonds and disburse the same by crediting it upon his savings department account which was opened after the deposit of $100 on December 24, 1918. Records of these transactions were kept by the bank on the safe keeping cards above referred to, each of which bore the number of Lewis's savings account pass book and that of the receipt. After the opening of the savings account said Lewis, for a time, made deposits therein and withdrew money therefrom. He never had an account in the commercial department of the bank. The savings department "pass book" of said Lewis was retained by the bank until November, 1931, when it was turned over by a clerk to Preston W. Lewis, a brother of Thornton B. Lewis. On December 8, 1920, one John E. Gilcreast, assistant secretary and trust officer of the bank, attached a note to the "safe keeping" cards which reads: "Do not deliver bonds on Thornton B. Lewis account without authority of the Court. Mr. Lewis is in Insane Hospital. See J. E. G." On March 3, 1921, Thornton B. Lewis died intestate.

It is plain that the authority of the bank, as agent of Thornton B. Lewis or as bailee of the bonds of Thornton B. Lewis, was suspended during the insanity of Lewis and terminated upon his death, although the bank had no means of knowing that Lewis had died when it performed the agreement which it was required to perform but for Lewis's incapacity and death. *Brown* v. *Cushman*, 173 Mass. 368, 372. *Long* v. *Thayer*, 150 U. S. 520. Am.

Law Inst. Restatement: Agency, §§ 120–122. This situation left the bank with the duty of exercising such diligence in the protection of the bonds as a prudent bank would exercise in taking care of and preserving the bonds deposited with it until the Probate Court duly appointed someone to represent the intestate estate of Thornton B. Lewis. The uncontradicted facts show that the bank after it knew of the insanity of Lewis, and after his death which was unknown to it, on December 13, 1922 (the date of the maturity of the three Victory Liberty Loan Bonds), presented these bonds to the Federal Reserve Bank of Boston for redemption, and received $300 principal and $7.14 interest, which it deposited in the savings department of the bank. The administratrix of Lewis's estate, appointed September 7, 1932, agrees that the course followed by the bank in the preservation of the bonds and the collection of interest was proper up to September, 1928, and the respondent seeks no change in the status of the $307.14.

On September 14, 1928, the bank presented to the Federal Reserve Bank of Boston for redemption the remaining bonds, which were to mature the next day, that had been deposited with the bank by said Lewis in 1918 and 1920. The principal and interest due and payable on these remaining bonds amounted to $1,300 principal and $27.67 interest. The Federal Reserve Bank of Boston credited said sum of $1,327.67 to the commercial account of the Exchange Trust Company. The commercial department issued its check for $23,133.40, which included the sum of $1,327.67, accompanied by a deposit slip to the savings department to be deposited to the Thornton B. Lewis account, and the teller of the savings department stamped the deposit slip as follows: "Bonds matured September 15, 1928 and credited to the above account. Teller." He added in his handwriting the initials "F. X. B." and the figures "$1,327.67." On the following day, September 15, 1928, Robert E. Fay, vice-president of the bank, notified the savings department that the sum of $1,327.67 had been improperly deposited in that department and caused the

said amount to be transferred to the commercial department. He issued a certificate which, without caption, date and signature, reads: "There has been........deposited in this bank Thirteen Hundred Twenty Seven....67/100 ....DOLLARS $1327 67/100....PAYABLE TO THE ORDER OF...........Thornton B Lewis..........upon presentation of this certificate properly endorsed." There cannot be the slightest doubt that it was within the authority of the proper officials of the bank, in the circumstances described, to transfer the entry from the books of the savings department to the books of the commercial department. It is plain on the facts, in the absence of any agreement, that, under G. L. c. 172, § 31, in relation to the disposition of the principal of the bonds in case they were called for redemption by the government, the moneys received on redemption, like the bonds themselves, were "general" and not special deposits. The action of the bank in converting the bonds into money after the death of Thornton B. Lewis did not by operation of law create a special deposit in the commercial department to which the administratrix could look for full reimbursement where the money received from the Federal Reserve Bank of Boston was so commingled that it could not be distinguished or traced. The petitioner manifestly has no preferential claim in the savings department or in the commercial department of the bank. The principles of law governing action against executor *de son tort* are not applicable here. See G. L. c. 195, § 15. Her remedy is found in the proof of claim against the bank for money had and received to her use.

*Decree affirmed with costs.*